CLOSED

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

CHAMBERS OF
**DENNIS M. CAVANAUGH**
JUDGE

UNITED STATES POST OFFICE
AND COURTHOUSE BUILDING
NEWARK, NJ 07101
Room No. 451
(973) 645-3574

NOT FOR PUBLICATION

LETTER-OPINION ORDER
ORIGINAL FILED WITH THE CLERK OF THE COURT

September 12, 2005

*Lawrence E. Kazmierczak, Esq.*
593 Ramapo Valley Road
P.O. Box 185
Oakland, New Jersey 07436

*Susan C. Branagan, Esq.*
Special Assistant U.S. Attorney
c/o Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-004

Re:    **Joyce Hill v. Jo Anne B. Barnhart, Commissioner of Social Security**

      **Civil Action No. 04-1725 (DMC)**

Dear Counsel:

This action comes before the Court upon application by Joyce Hill ("Plaintiff") to appeal

the final determination of the Commissioner of Social Security ("Commissioner") denying her a

period of disability, disability insurance benefits ("DIB") and Supplemental Security Income

("SSI"). After carefully considering the submissions of all parties and for the reasons set forth

below, it is the finding of the Court that the final determination of the Commissioner is

**remanded** for further proceedings.

-1-

**I**

Plaintiff first applied for a period of disability, DIB, and SSI benefits on March 6, 2002, alleging disability since December 20, 2000. (Tr. 12.)  The Regional Commissioner denied the application on October 17, 2002.  (Tr. at 53.)  A request for reconsideration was denied on November 11, 2002.  (Tr. at 63.)  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 16, 2003.  (Tr. at 23.)  The ALJ issued a decision in which he found Plaintiff was not under a "disability" at any time through the date of the decision.  (Tr. at 21.)  The Appeals Council affirmed the hearing decision on February 11, 2004 (Tr. 12) and the present action was commenced on April 14, 2004.

**II**

**A.    Testimony of Plaintiff**

Plaintiff was born on March 22, 1960. (Tr. at 27.)  She has an 11th grade education and some job training from Job Corp. (Tr. at 28.)  Plaintiff has held 30 different jobs in the 15 years preceding her claim.  (Tr. at 28.)   She was most recently employed at Toys 'R' Us for approximately one year where she worked in maintenance. (Tr. at 29).  Her daily duties required her to remain standing the entire day while cleaning, mopping, and supervising a small number of employees.  (Tr. at 29-30.)  Plaintiff also worked as a housekeeper for approximately six months which required her to be on her feet most of the time.  (Tr. at 30.)  While working at Myron Machine Company, where she remained seated the majority of the day, Plaintiff suffered a seizure and burned her arm on machinery equipment.  (Tr. at 31.)  Plaintiff was required to carry and lift boxes weighing up to 20 pounds for the three to four months she worked at Myron. (Tr. at 32.)  Plaintiff's job at Fuji Films lasted only three months, where she also had a seizure. (Tr. at 32.)

-2-

The record indicates that Plaintiff first sought treatment for seizures from Dr. Jorge Revoredo on November 8, 2001.  (Tr. at 184.)  Plaintiff testified that she takes her medication as indicated and that her prescription was recently increased from two to three times daily.  (Tr. at 33.)  Plaintiff testified that she currently experiences a seizure every three weeks which lasts from fifteen minutes to one hour.  (Tr. at 34.)

Plaintiff testified that she currently uses a cane to walk and "needs to slow down" more often.  (Tr. at 37-38.)  Plaintiff walks to church regularly and stays seated for 1.5 hours.  (Tr. at 37.)  She testified that she has "hit her head so many times, it's damaged [her] thinking" and now has to write things down to remember them.  (Tr. at 38.)  Plaintiff testified that she has no trouble lifting or carrying items, but that she most likely cannot lift more than fifty pounds.  (Tr. at 39, 43.)  Plaintiff testified that she is able to dress and bathe herself, but needs someone to watch her in the shower in case of a fall.  (Tr. at 40.)  She claims to have trouble reading due to blurriness and sometimes uses a magnifying glass to read..  (Tr. at 42.)

**B.**      **Medical Records**

The ALJ examined several medical reports submitted by hospitals or physicians who examined either Plaintiff or her records.   These include the following reports: Dr. Jorge Revoredo, M.D.; Dr. Ronald Bagner, M.D.; Dr. Alec Roy, M.D.; Quest Diagnostics; Essex Diagnostics Group; Barnert Hospital; Dr. Raymond Briski M.D.; and Dr. M. Didamo, Ph.D.

Dr. Revoredo's Medical Examining Physician's Report indicated a primary diagnosis of progressive grand mal epileptic seizures and minor diagnosis of anxiety and depression.  (Id. at 169.)  Dr. Revoredo indicated that Plaintiff may not work.  He noted that Plaintiff has several physical limitations, including the inability to stand for more than ten minutes, or walk more than five blocks.  Also, he opined that she also has a limited ability to climb, stoop, and bend,

and can lift no more than ten pounds.  Additionally, Dr. Revoredo noted that Plaintiff has limited use of her hands and unnamed psychological limitations.  (Tr. at 170, 176.)  Dr. Revoredo noted that Plaintiff's current medication is 100mg of injectable Dilantin. (Tr. )  Dr. Revoredo projected a disability of one year or more.  (Tr. at 171.)

Dr. Revoredo's neurological evaluation states that Plaintiff suffers from a condition resulting in convulsions four times a month.  (Tr. at 174.)  This condition is somewhat controlled by medication, but the convulsions are increasing in frequency.   (Tr.)   Also, Plaintiff has generalized weakness of muscles and mild numbness in her hands.   (Tr.)   Dr. Revoredo's psychiatric evaluation notes that Plaintiff's anxiety and depression do not limit her mental ability, judgment, or competence to make decisions concerning her well-being or the handling of money. (Tr. at 175.)

Dr. Revoredo indicated that Plaintiff's condition is permanent and cannot be improved, corrected, or controlled by medical, surgical, or rehabilative procedures.  (Tr.)  In his opinion, Plaintiff may not and will not be able to return to work full-time in the position she formerly held, nor is she able to train for new employment.  (Tr. at 177.)  He diagnoses Plaintiff as permanently disabled due to the "recurrency [sic] and length of [her] seizures." (Tr.)

The General Medical report submitted by Dr. Revoredo to the Division of Disability Determination Services stated that Plaintiff suffers from acute seizure disorder, a herniated disc, anxiety, and depression.  (Tr. at 184.)  Her treatment history includes Dilantin, Naproxen, and Depakote.  (Tr. at 185.)   The report further indicates that Plaintiff needs a "neurological evaluation to further confirm her diagnostic and disabilities for permanent disability." (Tr.)

Dr. Revoredo's progress notes from November 8, 2001 to April 9, 2002 indicate that he saw Plaintiff on November 8, 2001, for complaints of headaches and seizures. (Tr. at 187.)  Dr.

Revoredo noted that Plaintiff claims to have had seizures since 1991 and received no prior medication for seizures.  (Tr.)  Plaintiff claims she suffered from seizures lasting thirty to sixty minutes at a frequency of three times per month.  (Tr.)  On November 9, 2001, Dr. Revoredo prescribed Naproxen and 100mg of Dilantin.  (Tr. at 188.)  On December 11, 2001, he prescribed 125mg of Depakote and 100mg of Dilantin. (Tr.)  On January 16, 2002, he renewed both prescriptions. (Tr.)

On February 26, 2002, Plaintiff returned to Dr. Revoredo's care after a seizure caused her to fall while crossing the street.  (Tr. at 189.)  She hit her head and was experiencing pain in her central, upper, and lower back, as well as her right knee. (Tr.)  Dr. Revoredo prescribed 25mg Vioxx, 5mg Diazepam, and 10mg Flexavil. (Tr.)  Plaintiff returned on February 20, 2002, and again on March 4, 2002, complaining of severe pain in her right knee. (Tr.)  Dr. Revoredo diagnosed a torn ligament, ordered an MRI of Plaintiff's right knee and back, and prescribed 100mg of Demerol. (Tr.)  Plaintiff returned on March 26, 2002, complaining of pain in both knees, and was prescribed 50mg of Demerol and 100mg of Dilantin. (Tr. at 190.)  On April 9, 2002, Plaintiff returned again, complaining of pain and headaches. (Tr.)

Dr. Ronald Bagner, M.D., examined Plaintiff on September 17, 2002. (Tr. at 204.) Plaintiff primary complaint was seizures that occur approximately once per year. (Tr.)  Plaintiff also complained of lower back and knee pain, and frequent headaches. (Tr.)  She stated that her knee and shoulder pain had improved.  (Tr.)

Dr. Bagner found Plaintiff moved slowly but did not use a cane.  Plaintiff had no difficulty dressing or remaining seated. (Tr. at 204.)  He did note that Plaintiff had mild difficulty getting on and off the examining table. (Tr. at 204.)  Plaintiff also exhibited signs of pain during movement of her lower back and Dr. Bagner described her spine extension as 0-50

out of a possible 0-90. (Tr. at 205, 207.) Dr. Bagner noted that Plaintiff did not experience pain during knee movements. (Tr. at 205.)

Dr. Alec Roy, M.D. conducted an examination of Plaintiff on September 28, 2002. (Tr. at 208.) Plaintiff told Dr. Roy that her main problem was seizures, and that she has a grand mal seizure every three to five months. (Tr.). In addition, Plaintiff told him she was not sleeping well and had a decreased appetite. (Tr.) Plaintiff also claimed to be depressed and "stressed out because [she had] to pay so many bills." (Tr.) Plaintiff stated that she had never been a psychiatric inpatient, seen a psychiatrist or had a problem with alcohol or illicit drugs. (Tr. at 209.) When asked about her daily activities, Plaintiff told Dr. Roy that she lives in an apartment with her daughter and cleans and goes shopping while her daughter is out. (Tr.)

Dr. Roy described Plaintiff as cooperative and able to follow the topic of conversation, but noted that she appeared to be in low spirits. (Tr. at 209.) During his examination, Dr. Roy found no evidence of memory problems and Plaintiff was able to do simple calculations. (Tr.) Dr. Roy concluded that Plaintiff had an adjustment disorder with depressed mood, seizures, problems with health, employment, and payment of bills. (Tr. at 210.) Dr. Roy also noted that he had no medical records available to him but he believed that counseling and a day-care program would benefit Plaintiff. (Tr.)

On February 20, 2002, Dr. Revoredo ordered a MRI of Plaintiff's cervical spine, dorsal spine, left shoulder, and right knee. (Tr. at 189.) Dr. Valery Kalika, M.D. interpreted the MRI results. (Tr. at 191.) The MRI of Plaintiff's lower spine indicated an annular bulge at L4-L5, which was consistent with a vertebral body hemangioma and radial tear. (Tr. at 192.) The MRI of her left shoulder indicated tendinitis, impingement of the rotator cuff, and slight glenohumeral joint effusion. (Tr. at 194.) The MRI of Plaintiff's cervical spine indicated a paracentral

-6-

posterior disc herniation at C4-C5 which was exerting pressure on the central aspect of the spinal cord. (Tr. at 195.) There was also a posterior disc herniation at C5-C6 and a central to right posterior herniation of C6-C7 "exerting pressure across the entire ventral aspect of the thecal sac." (Tr.) There was also evidence of a curvature of the spine, suggesting muscle spasms and cervical myalgia. (Tr.) The MRI of Plaintiff's right knee indicated a partial tear of the MCL, joint effusion, and a degenerative cyst of the lateral tibial plateau. (Tr.)

On January 2, 2003, Plaintiff had a CT scan of her abdomen and pelvis following complaints of abdominal pain. (Tr. at 246.) The CT scan showed a small cyst that has remained unchanged since October 6, 1999, and also indicated Plaintiff was post hysterectomy. (Tr.)

On July 22, 2002, Plaintiff underwent blood work to determine her Dilantin and Valproic acid levels. (Tr. at 201.) However, the lab performed a Bilirubin test instead of Dilantin test. (Tr. at 212.) The level of Valproic acid was less than 12.5 mg/L and total, direct and indirect levels of Bilirubin were .47, .08 and .38 mg/dL, respectively. (Tr.) On September 30, 2002,

Dr. Briski reordered Plaintiff's blood work to determine Dilantin levels. (Tr. at 212.) The report indicated Dilantin levels of 6.7 mg/L and stated "toxicity is seldom seen with levels below 25 mg/L." (Tr. at 214.)

Dr. Raymond Briski, M.D., a state agency psychiatrist, reviewed and examined all the evidence in Plaintiff's file on October 9, 2002. (Tr. at 215-223.) Dr. Briski stated that Plaintiff suffers from a seizure disorder and determined that she possessed "sub-therapeutic Dilantin/Valproic acid levels." (Tr. at 216.) He stated her only postural limitation is that she should never climb a ladder, rope, or scaffold. (Tr. at 217.) Dr. Briski also indicated that Plaintiff should avoid all exposure to hazards such as machinery and heights. (Tr. at 219.) He

-7-

concluded that the "allegations of seizure symptoms are consistent with the diagnosis of and treatment for a seizure disorder." (Tr.)

Dr. M. Didamo, Ph.D., conducted a psychiatric evaluation of Plaintiff's file on October 19, 2002. (Tr. at 224.) He concluded that she suffered from non-severe affective adjustment disorder. (Tr.) In Dr. Didamo's opinion, Plaintiff's disorder resulted in mild restrictions of daily living activities and mild difficulties in maintaining social functioning and concentration. (Tr. at 234.) Dr. Allan M. Hochley, M.D., also reviewed the file and concurred with Dr. Didamo's assessment on November 26, 2002. (Tr.)

## III

### A.    Standard of Review

42 U.S.C. § 405(g) provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action." Accordingly, also pursuant to § 405(g), the District Court may review the transcripts and records upon which the Commissioner based his determination. Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000). If supported by substantial evidence, the Court must accept as conclusive the factual findings of disability made by the Commissioner. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999); Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Substantial evidence is "more than a mere scintilla." Burnett v. Commissioner, 220 F.3d 112, 118 (3d Cir. 2000); Ventura, 55 F.3d at 901 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This definition "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept to support a conclusion."

-8-

Morales, 225 F.3d at 316 (3d Cir. 2000); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).

The substantial evidence standard allows a court to review a decision of the ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. Stewart v. Secretary of Health, Educ. and Welfare, 714 F.2d 287, 290 (3d Cir. 1983); Clauseen v. Chater, 950 F. Supp. 1287, 1292 (D.N.J. 1996). The standard is "deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). The Court must review the record as a whole to determine whether substantial evidence is present to support the decision of the ALJ. Id.

Reasonable minds can reach different conclusion following review of the evidentiary record upon which the decisions of the Commissioner is based. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994) (quoting Richardson, 402 U.S. at 401 (1971)). Nevertheless, in such cases, the function of a District Court is to determine whether the record, as a whole, contains substantial evidence to support the findings of the Commissioner. Id. at 46; Shaudeck, 181 F.3d at 431. A court may not displace the choice of an administrative body "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." N.L.R.B v. Greensburg Coca-Cola Bottling Co., 40 F.3d 669, 672-73 (3d Cir. 1994) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)); see also Hartranft, 181 F.3d at 360. Nonetheless, the ALJ is expected to do more than simply state factual conclusions. Stewart, 714 F.2d at 290; Claussen, 950 F.Supp at 1292. Rather, the ALJ must make specific findings of fact to support his or her ultimate findings. Sykes v. Apfel, 228 F.3d 259, 269 (3d Cir. 2000).

The ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when the testimony of a physician treating a claimant is rejected. Morales, 225 F.3d at 320; Plummer, 186 F.3d at 429; Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). The ALJ must also give serious consideration to the subjective complaints of pain of the claimant, even when those assertions are not fully confirmed by objective medical evidence. Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993); Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986). Where a claim is supported by competent evidence, the ALJ must specifically weigh that evidence. Schaudeck, 181 F.3d 429, 435 (citing Dombrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)).

## B.   Five Step Sequential Analysis

Title II of the Social Security Act ("the Act") provides for the payment of benefits to persons who suffer from disabilities who have made contributions to the disability insurance program. 42 U.S.C. § 423(a)(1)(D). Title XVI of the Act, entitled Supplemental Security Income for the Aged, Blind and Disabled[1], provides for the payment of benefits to indigent persons who are disabled. 42 U.S.C § 1381(a)[2]

Both Titles II and XVI provide for the payment of benefits when a claimant has established his or her inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

---

[1] Social Security Amendments of 1972, Pub. L. NO 92-603, §§ 1601-36, 86 Stat. 1465-93 (codified as amended at 42 U.S.C. §§ 1381-83d).
[2] Because the standards of eligibility under Title II and judicial review thereof are virtually identical to the standards under Title XVI, decisions rendered under 42 U.S.C. § 423 are also applicable to decisions rendered under 42 U.S.C. §1381(a). Sullivan v. Zebley, 493 U.S. 521, 525 n.3 (1990).

42 U.S.C §§ 423(d)(2)(A); 1382c(a)(3)(B); see also Schaudeck, 181 F.3d at 431.

The Act further provides an individual shall be determined to be under a disability only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education and work experience, engage in any other kind of substantial gainful work activity which exists in the national economy 42 U.S.C §§ 423(d)(2)(A); 1382c(a)(3)(B); see also Sykes, 228 F.3d 259, 262.

In accordance with the authority granted under 42 U.S.C § 405(a), the Commissioner has promulgated regulations ("Regulations") to give effect to and further define the provisions of the Act. 20 C.F.R. §§ 404.1520, 416.920.  The Regulations provide for a five-step sequential evaluation of the claim of an individual for DIB and SSI.  Morales, 225 F.3d at 316; Sullivan, 493 U.S. at 525; Knepp, 204, F.3d at 82; Schaudeck, 181 F.3d at 431-432.

In step one, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity:

> Substantial gainful activity is work that both substantial and gainful … Substantial work activity is activity that involves doing significant physical or mental activities.  [An applicant's] work may be substantial even if it is done on a part-time basis or if [the applicant] do[es] less, get[s] paid less, or ha[s] less responsibility than when [the applicant] worked before … Gainful work activity is work activity that [the applicant] do[es] for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. §§ 404.1520(a), 416.920(a).

If a claimant is found to be engaged in substantial gainful activity, the claim of disability will be denied, regardless of medical condition.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987) (citing 20 C.F.R. § 404.1520(b)).

If the claimant is not engaged in substantial gainful activity, the analysis of the claim proceeds to step two. Step two, commonly known as the "severity regulation," involves a minimum threshold determination of whether the claimant is suffering from a severe impairment. 20 C.F.R. §§ 404.1520(c)), 416.920(c)). An impairment is considered severe if it is "of a magnitude sufficient to limit significantly the individual's 'physical or mental ability to do basic work activities.'" Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982) (quoting 20 C.F.R. § 404.1520(c)).

Evidence of a "physical or mental impairment" must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "An individual shall not be considered to be under a disability unless he [or she] furnished such medical and other evidence of the existence thereof as the Commissioner may require." 42 U.S.C § 423(d)(5)(A). The Commissioner, however, cannot make "speculative inferences from medical opinions"; a medical opinion may only be rejected on the basis of "contradictory medical evidence." Plummer, 186 F.3d at 428. When a medically determinable impairment exists which can reasonable be expected to produce pain, the intensity and persistence of symptoms must also be evaluated in order to determine what impact, if any, they have on the ability of the claimant to work. Sweeny v. Commissioner of Social Security, No. 99-6048, slip op. at 17 (3d Cir. June 20, 2000) (citing 20 C.F.R. § 416.929(c)(1)).

> If a claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone, consideration will also be given to such factors as the individual's daily activities; the location, duration, and intensity of the individual's pain; precipitating and aggravating factors; the type, and side effects of medication; treatment received for the relief of pain; and any other measures used for pain relief.

Sweeny at 17 (referencing 20 C.F.R § 416.929(c)(3); S.S.R. 96-7p).

-12-

The ability to do basic works activities is defined as having "abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment'; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "dealing with changes in a routine work setting." Yuckert, 482 U.S. at 141 (quoting 20 C.F.R. § 404.1521(b)).

An ALJ need only consider medical evidence in step two, without regard to vocational factors such as the age, education, or work experience of the claimant.  Id. (citing 20 C.F.R. §§ 404.1520(c), 416-920(c)).  In step two of the analysis, the claimant must make the threshold showing that his or her impairments are sufficiently severe to satisfy this standard. Id. at 146 n.5. If a claimant fails to make this showing, he or she is ineligible for DIB or SSI benefits. Id. at 148; Santise, 676 F.2d at 927.

If the claimant is not engaged in substantial gainful activity and has a severe impairment, the evaluation proceeds to step three.  Step three requires a determination of "whether the impairment is equivalent to one of a number of listed impairments [(the "listed impairments")] that the Commissioner acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141.  "If the impairment meets or equals [a] [l]isted [i]mpairment[s], the claimant is conclusively presumed to be disabled." Id.; see also 20 C.F.R. §§ 404.1520(d), 416.920(d); Schaudeck, 181 F.3d at 432.  In Burnett, 220 F.3d at 119, the court held that the ALJ's "bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment was insufficient." While Burnett "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis," it exists to "ensure that

-13-

there is sufficient development of the record and explanation of findings to permit meaningful review." <u>Jones v. Barnhart</u>, 88 F.App'x. 509 (3d Cir. 2004).

If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Under these steps, "the Commissioner must determine whether the claimant retains the ability to perform either his [or her] former work or some less demanding employment." <u>Zebley</u>, 493 U.S. at 535 (<u>quoting</u> <u>Hecker v. Campbell</u>, 461 U.S. 458, 469 (1983)); <u>see</u> <u>also</u> <u>Adorno</u>, 40 F.3d at 46; <u>Williams</u>, 970 F.2d at 1187.

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform work he or she performed in the past. 20 C.F.R. §§ 404.1520(e), 416.920(e); <u>Shaudeck</u>, 181 F.3d 431. Residual functional capacity is defined as what the claimant "can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ must evaluate the physical and mental requirements of the claimant's past work experience in determining the residual functional capacity. <u>Knepp</u>, 204 F.3d at 82; <u>Velazquez v. Heckler</u>, 802 F.2d 680, 682 (3d Cir. 1986); 20 C.F.R. §§ 404.1520(e), 416.920(e).

"At step four, vocational factors [such as age, education and work experience] are not considered in determining whether or not a claimant retains the residual functional capacity to perform past relevant work." <u>Williams</u>, 970 F.2d at 1887; <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1560(b), 416.960(b). If the claimant is able to meet the demands of his or her past work, then he or she is not disabled within the meaning of the Act. <u>Yuckert</u>, 482 U.S. at 141; <u>Scahudeck</u>, 181 F.3d at 432; <u>Adorno</u>, 40 F.3d at 46. At step four, as with the previous steps, the claimant bears the burden of proof. <u>Yuckert</u>, 482 U.S. at 146 n.5; <u>Adorno</u>, 40 F.3d at 46.

If a claimant demonstrates an inability to resume his or her former occupation, the evaluation moves to step five. At this final stage, the burden of proof shifts to the

-14-

Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. <u>Morales</u>, 225 F.3d at 316; <u>Yuckert</u>, 482 U.S. at 146 n.5; <u>Adorno</u>, 40 F.3d at 46. Furthermore, a determination of disability by an ALJ at step five must be based upon the age, education, work experience, and residual functional capacity of the claimant. 20 C.F.R. §404.1520(f), 416.920(f); <u>Schaudeck</u>, 181 F.3d at 432. The ALJ must also analyze the cumulative effect of all the impairments on the claimant. 20 C.F.R. §§ 404.1545, 416.945.

**C.    <u>Decision of Administrative Law Judge</u>**

The ALJ determined that while the record shows Plaintiff did post earnings after the alleged onset date, they were the result of an unsuccessful work attempt. (Tr. 14.) Thus, the ALJ determined Plaintiff has not been engaged in substantial gainful activity since December 20, 2000. <u>Id.</u> Accordingly, the ALJ then continued to step two.

Step two and step three required the ALJ to determine whether Plaintiff suffers from a severe impairment or combination of impairments, and if so, whether the impairment meets or equals the criteria set forth in the listed impairments. <u>Morales</u>, 225 F.3d at 317; <u>Yuckert</u>, 482 U.S. at 142 n.5, <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1520(d), 416.920(d); <u>Schaudeck</u>, 181 F.3d at 432.

The ALJ determined that while Plaintiff's claimed musculoskeletal impairment was not severe, she had substantiated the existence of a severe seizure impairment. (Tr. 15.) Plaintiff's musculoskeletal impairment did not qualify as severe for three reasons. First, the treatment for musculoskeletal symptoms lasted only a few months, from February to April of 2002, far from the required duration of at least 12 consecutive months. (<u>Id.</u> at 15, 188-190.) Second, Plaintiff told both Dr. Roy and Dr. Bagner that her main problem was seizures and not musculoskeletal impairment or pain. (<u>Id.</u> at 204, 208.) Lastly, in the opinion of the medical consultant, Plaintiff

-15-

suffers from a severe seizure disorder with no external limitations attributed to any musculoskeletal disorder. While not binding on the ALJ, a medical consultant's opinion is considered findings of fact on the nature and extent of the claimant's impairments, including the existence of a severe impairment and are treated as expert medical opinions from non-examining sources. 20 C.F.R §§ 404.1527(f), 416.927(f) and S.S.R. 96-6p.

While Plaintiff contends that Dr. Bagner stated Plaintiff had difficulty dressing and was uncomfortable in the seated position, Dr. Bagner's report indicates the opposite. (Plaintiff's Letter of July 1, 2004; Tr. 204.)  Dr. Bagner noted that Plaintiff was able to dress and undress unassisted, mount and dismount the examining table with moderate difficulty and had only a limited range of motion. (Tr. 205.)  Dr. Bagner also noted that while Plaintiff ambulated slowly she did so without the assistance of a cane or walking aid.  (Tr, at 204-205.)  The MRI of Plaintiff's upper and lower spine revealed a herniated disc in the C5-C6 and C6-C7 area.  (Tr. at 195-196.)  However, due to the opinions of the medical consultant and Dr. Revoredo's treatment records, the ALJ determined that the medical evidence did not show this condition was severe. (Tr. at 18.)

The ALJ further questioned the medical source statements made by Dr. Revoredo, that Plaintiff is "totally disabled." (Tr. at 18.)   A medical source's opinion that the claimant is "totally disabled" is not conclusive, as this is an issue reserved for the Commissioner.  20 C.F.R §§ 404.1527(e), 416.927(e); S.S.R 96-5p.  Thus, such a statement is never entitled to controlling or substantial evidentiary weight. (Id.)  The ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when the testimony of a treating physician is rejected. Morales, 225 F.3d at 320; Plummer, 186 F.3d at 429; Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris,

642 F.2d 700, 705 (3d Cir. 1981).   The ALJ noted that Dr. Revoredo's conclusion was inconsistent with Plaintiff's admitted abilities, including Plaintiff's testimony that she had no difficulty moving around, could lift up to 50 pounds and had an active daily life. (Tr. at 19). At the hearing of October 16, 2003, the ALJ requested a statement from Dr. Revoredo indicating the frequency of Plaintiff's seizures when she was medicated. (Tr. 47.)   In Plaintiff's letter of December 1, 2003, Plaintiff explained that Dr. Revoredo was reluctant to furnish a statement until the Plaintiff was seen by a neurologist. (Tr. at 78.)   As such, Plaintiff was unable to provide this evidence.   In light of the fact that no reasonable estimate could be made as to when the ALJ would receive this report, and based on the inconsistencies between Dr. Revoredo's opinions and Plaintiff's admitted abilities and the opinions of the medical consultants, the ALJ found the "treating source opinions of the claimant as being 'totally disabled' [were] of minimal probative value." (Tr. at 19.)   On this basis, the ALJ found Plaintiff's symptoms and functional limitations were not as debilitating as alleged. (Tr.)

While Plaintiff's seizure disorder is severe it is unclear as to whether or not it meets or equals a listed impairment under 20 C.F.R Part 404, Subpart P, Appendix 1, § 11.00(A), § 11.02(A).   The ALJ did not discuss which listed impairment he believed Plaintiff did not meet, nor his reasoning behind such decision.   He merely stated "the record does not establish any medical findings on either examination or diagnostic test work-up that meet or equal the criteria contained under the Listings." (Tr. at 16.)

The listed impairment dealing with epileptic seizures requires that grand mal seizures must be documented by a detailed description, including all associated phenomena and must occur "more frequently than once a month in spite of at least 3 months of prescribed treatment." 20 C.F.R Part 404, Subpart P, Appendix 1, § 11.00(A), § 11.02(A).   It also calls for testimony of

-17-

persons other than the claimant to help describe the type and frequency of the seizures. (Id.)  It is essential that the claimant is following her prescribed antiepileptic treatment. (Id.)  To determine if this is the case, the ALJ first must look to the treating physician's clinical findings, or, if not available, a blood test to determine the phenytoin sodium levels. (Id.)  If the reported blood levels are low, the treating physician should include a statement as to why the levels are low and the results of any relevant diagnostic studies. (Id.)

The ALJ discounted Plaintiff's reports or injuries due to seizures but did not address why the severe seizure disorder did not qualify as a listed impairment.  Plaintiff testified that since she has been taking her medicine, she suffers seizures "every three weeks, every month" which clearly fits the frequency requirement.  (Tr. at 31.)  While the ALJ discussed his reasons for discounting Plaintiff's testimony, he did not address the claims made on questionnaires by the Plaintiff's friend or neighbor.  Plaintiff's friend, Clarence Wright stated in a detailed description that Plaintiff suffers seizures two or three times a month that last from 10 to 20 minutes and that, during her seizures she shakes, bites her tongue, and hits her head. (Tr. 118.)  Kema Page, a neighbor of Plaintiff stated on her "Activity of Daily Living Questionnaire" that Plaintiff, "has seizures pretty often, when she does we have to hold her down because she hits her head [and] it leaves a mark.  Her seizures are pretty bad it takes a few of us to hold her down." (Tr. 139.)

The ALJ made reference to the October 4, 2002  blood test which measured Plaintiff's Dilantin level at 6.7 mg/L.  (Tr. at 214.) A low blood level requires the treating physician to include a statement as to why the levels are low and the results of any relevant diagnostic studies. 20 C.F.R Part 404, Subpart P, Appendix 1, § 11.00(A).  No such statement was requested by the ALJ, nor was there a diagnostic study made.

At the close of the hearing before the ALJ, the record remained open for Plaintiff's counsel to obtain Dr. Revoredo's statement or estimate of the current frequency of Plaintiff's seizures. (Tr. 46-47.)  This statement from Dr. Revoredo was "necessary to support a finding that [her] condition met the requirements for a listed impairment." Jozefick v. Shala, 854 F.Supp. 342, 350 (1994).  In Jozefick, the court noted that the testimony of the plaintiff's doctor may be helpful "to produce information necessary to support a finding that [plaintiff's] condition [meet] the requirements for a listed impairment"and "[t]his possibility [is] sufficient to warrant a remand. (Id. at 350.)  Here, the ALJ did not fully exercise his authority to develop the record and to fill in significant evidentiary gaps material to a disability determination.  See Coulter v. Weinberger, 527 F.2d 224 (3d Cir.1975); see also, Walsh v. Heckler, 608 F.Supp. 500, 501 (E.D.Pa.1985)

By leaving the record open, the burden is solely on the claimant to establish the record. While the ALJ does not have to go to great lengths to develop the claimant's case, the ALJ's duty to develop the record applies in cases where the ALJ believes that he or she is lacking information critical to the determination of a factual issue. See Ferguson, 765 F.2d at 36; Thompson v. Califano, 556 F.2d 616, 618 (1st Cir.1977).  As the court noted in Thomas v. Chater, 1997 WL 256458 (E.D.Pa.)(quoting Ferguson v. Shweiker, 765 F.2d 31 (3rd Cir.1985)), "if medical documentation is insufficient or unclear, it is incumbent upon the ALJ to secure whatever evidence he believe[s] is needed to make a sound determination."  Here, the ultimate determinative fact, whether Plaintiff has the requisite number of seizures per month, is missing from the record.

The ALJ has the authority to issue a subpoena to Dr. Revoredo on his own notion.  20 C.F.R § 404.950(d) (1993).[3]  As it appears from the record that the ALJ deemed Dr. Revoredo's statement significant and reasonably necessary to determine the frequency of Plaintiff's seizures, he should have requested or even subpoenaed the report or the doctor himself.

## IV

Based on the foregoing reasons, the finding that Plaintiff was not disabled is not supported by substantial evidence.  Accordingly, the matter is **remanded** for the submission of additional evidence in order to develop a complete record.

***SO ORDERED.***

DENNIS M. CAVANAUGH, U.S.D.J.

Original:        Clerk's Office
Copies:          File

---

[3]        This 20 CFR 404.950(d), in pertinent part, provides:  When it is reasonably necessary for the full presentation of a case, an administrative law judge … may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses.